[No. D011272. Fourth Dist., Div. One. Jan. 16, 1991.]

ALAN BAILEY, Plaintiff and Appellant, v.
CITY OF NATIONAL CITY et al., Defendants and Respondents.

**[Opinion certified for partial publication.[1]].**

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II.A. and III.

1322

**COUNSEL**

Everett L. Bobbitt for Plaintiff and Appellant.

Everett L. Bobbitt and Christopher L. Ashcraft as Amici Curiae on behalf of Plaintiff and Appellant.

George H. Eiser III, City Attorney, and Linda Kaye Harter, Assistant City Attorney, for Defendants and Respondents.

**OPINION**

**FROEHLICH, J.**—Alan Bailey appeals from a judgment denying his petition for a writ of mandamus. Bailey, a police officer with respondent City of National City, was terminated based on his alleged violations of the city's police department rules and regulations.[2] Bailey petitioned the superior court for a writ of mandamus, contending the action of the city council in upholding his termination was an abuse of discretion and was unsupported by the evidence. Bailey also contended that rule 3.3, one of the rules he was found to have violated, could not be relied upon because it was unconstitutionally vague and overbroad.

After reviewing the transcripts and evidence from the administrative hearing, the trial court exercised its own independent judgment and concluded the findings by the city council were clearly supported by the evidence. It further determined the city council's action to terminate Bailey was not an abuse of discretion. Additionally, it found rule 3.3 was constitutional as applied in this case.

---

[2] All rule references are to the city's police department rules and regulations.

We find there is substantial evidence to support the trial court's independent judgment that termination was not an abuse of discretion on the facts of this case. We also conclude there is no constitutional infirmity in placing partial reliance upon Bailey's violation of rule 3.3 to support the termination.

## I. *Summary of Background*

Bailey was accused by the city of violating several police department rules. The first alleged transgression was that he undertook outside employment (assisting a civil attorney in accident reconstruction) without obtaining the requisite prior permission from the department. A second rule violation occurred when he testified at the civil arbitration hearing wearing his police uniform, in violation of a rule precluding an officer from using the visible indicators of his official position for personal financial gain. Bailey's most serious rule violation occurred when he continued to have contacts with an old friend (who had been convicted of a felony) after being warned not to do so, thus violating rule 3.3 which prohibited continuous personal associations with felons.

After an administrative investigation confirmed these accusations, the city notified Bailey of its intent to terminate his employment. Bailey requested and was granted a *Skelly* hearing,[3] which was held before a reviewing officer, who found termination for the various rule violations to be proper.

Bailey then appealed to the city civil service commission. After a hearing lasting several days, the commission found Bailey had violated four separate rules, but recommended the imposition of penalties other than termination—suspension, reduction in salary step, and repayment by Bailey of certain vacation benefits he had received.

Both Bailey and the police department appealed the civil service commission's decision to the city council. The city council reviewed the testimony, exhibits and record and issued its determination in the form of resolution No. 15,844. The resolution made a series of factual findings and concluded therefrom that violation by Bailey of four different police department rules had been established. Because the city council found the nature and gravity of the violations were substantial, it concluded that imposition of the most serious discipline was appropriate and ordered reinstatement of Bailey's termination.

---

[3] *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774].

 We review the trial court's affirmance of this action by using the "substantial evidence" test as to the factual findings and the "abuse of discretion" test as to the determination that the gravity of the violations supported the remedy of termination.[4]

II. *There Is Substantial Evidence to Support the Factual Findings Upon Which the Disciplinary Action Was Based*

A. *Outside Employment**

. . . . . . . . . . . . . . . . . . . .

B. *Associating With a Felon*

Rule 3.3 prohibits police officers from continuous personal associations with felons other than as required to perform their official duties.[5] The civil service commission, the city council and trial court all found, as a factual matter, Bailey violated this rule along with rule 1.6 (requiring obedience to lawful orders) by continuing his association with one Eddie Smith, despite knowing Smith was a felon and despite a specific order to cease associating with Smith. While Bailey claims these findings are "totally unsupported by the evidence," we conclude the evidence, along with all permissible inferences drawn in favor of the trial court's judgment (see *Richardson* v. *Board of Supervisors* (1988) 203 Cal.App.3d 486, 492-493 [250 Cal.Rptr. 1]), supports the findings.

---

[4] The scope of review of disciplinary proceedings varies depending upon the level of review. Findings of fact made by the administrative agency are subject to the independent judgment test when reviewed by a trial court, while trial court review of the discipline imposed is based on the abuse of discretion standard. The latter rule derives from the concept that the trial court is not free to substitute its opinion for that of the administrative body as to an appropriate disciplinary measure. (*Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494, 500-502 [210 Cal.Rptr. 788].)

On appeal, the trial court's determination of factual matters must be affirmed if it is supported by substantial evidence. (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 386-387 [146 Cal.Rptr. 892].) The appellate court's review of the degree of discipline imposed, however, remains the same as that appropriate to the trial court: The discipline imposed will not be disturbed unless it is shown to have been a manifest abuse of discretion. (*Schmitt* v. *City of Rialto, supra,* 164 Cal.App.3d at pp. 501-502.)

* See footnote 1, *ante,* page 1319.

[5] Rule 3.3 provides: "*Personal Associations.* Employees shall avoid continuous associations or dealings with persons who they know or should reasonably suspect are racketeers, sexual offenders, felons, suspected felons, persons under criminal investigation or indictment, or who have a reputation in the community for present felonious involvement or criminal behavior, except as necessary in the performance of official duties."

Bailey and Smith were close personal friends. Smith had introduced Bailey to the attorney who hired Bailey for the accident reconstruction testimony referred to above; Smith had been best man at Bailey's wedding in July 1987; and indeed, Smith had given Bailey money to help pay for that wedding. In October 1987, Smith suffered a conviction for felony solicitation. In November 1987, Bailey wrote a letter to the sentencing judge (using police department letterhead and signing the letter in his official capacity) in support of his friend, urging the court to grant probation rather than impose a prison term.

When the police department learned of this letter in December 1987, Sergeant Darton met with Bailey to discuss the improprieties of his conduct and to review and discuss the various rules Bailey had violated. During that meeting Darton ordered Bailey to disassociate himself from Smith because Smith was a convicted felon. Although Bailey expressed his belief Smith was not a felon, but had instead suffered only a misdemeanor conviction, Darton reiterated (after confirming the facts with others) that Smith was in fact convicted of a felony.

Despite both rule 3.3 and Darton's order, Bailey maintained his friendship with Smith. During the hearings Bailey admitted to only one meeting and one phone call with Smith between the December counseling session and the start of the administrative investigation in July 1988. However, these incidents could be, and apparently were, viewed by the triers of fact as symptomatic of a broader ongoing relationship, since all the triers of fact concluded Bailey had continued his association with Smith.

The first admitted contact was a "business" lunch, at which Bailey met with a Mr. Gardella (the owner of a mortgage company) and Smith (a loan officer with the company) to discuss a loan for Bailey's parents, and also to discuss a possible loan for Bailey to purchase a home. The meeting was of an unusual nature in that it was held to discuss a loan for persons *not even present* (i.e., Bailey's parents); it was attended by the owner of the mortgage company, whose personal presence seems superfluous to a routine loan transaction unless it was to permit Smith to "lobby" on behalf of his friend, Bailey; and it was a luncheon meeting, an informal setting more conducive to such "lobbying" activity than to a routine examination of the financial data on which normal lending decisions turn. A trier of fact could well infer such a meeting exemplified Bailey's ongoing relationship with Smith and Bailey's attempt to capitalize upon it.

The only other contact to which Bailey admitted was a series of phone calls sometime in late May. Smith's wife had been arrested by an Officer Silva of the National City Police Department, and Smith called upon Bailey

to act as liaison between Smith and Silva. Smith called Bailey at home late one night, explaining his wife had been cited and released. He asked Bailey to contact Silva and give Silva the phone number of the Smiths, who wished to talk to Silva. Bailey took steps to help his friend by immediately contacting Silva in the field (via a message relayed through the police dispatcher), and telling Silva that Smith wanted Silva to call him. When Silva told Bailey he could not call Smith because he had no money for the pay phone, Bailey immediately arranged for Smith to call Silva at the phone booth. As a result of those contacts, Silva met with Smith and gave Smith a copy of a police report of the incident, an action for which Silva later was reprimanded. The trier of fact could infer Smith had used Bailey as a liaison, rather than contacting Silva directly, because Smith could rely on Bailey for help, based on their ongoing personal relationship.

In addition to the specifically provable contacts, the general tenor of Bailey's comments fortified the conclusion that he had not severed his relationship with Smith. During the administrative investigation Bailey was interviewed by Captain Short on July 1, 1988. Bailey told Short, in essence, he still considered Smith to be his friend; it was his opinion Smith was not a felon; he and Smith had had several contacts; and he had continued his relationship with Smith. Short testified that Bailey's characterization of his relationship with Smith as continued friendship, his actual contacts with Smith and his wife, and Bailey's opinion that Smith was not a felon despite Darton's information, reflected Bailey's intention of relying on his own information and judgment as to whether or not he would terminate his association. Indeed, even at the civil service hearings three months later Bailey considered Smith to be his friend during the relevant period, indicating he still respected Smith and stating "basically, my opinion about Eddie Smith is he's made some mistakes in his life and I think he's paid for it."

The tenor of these statements, both to Captain Short and at the hearing, reflected Bailey's reluctance to accept the fact that Smith was a felon with whom he could not associate. Their prior close personal relationship, and the contacts between Bailey and both Smith and his wife notwithstanding Darton's December 1987 directive, provide substantial evidence to support the factual conclusion that Bailey continued his association with Smith.

III. *The Discipline Imposed Was Not an Abuse of Discretion**

. . . . . . . . . . . . . . . . . . . . . .

---

*See footnote 1, *ante*, page 1319.

IV. *Rule 3.3 Is Not Unconstitutionally Vague as Applied to Bailey*

■ Bailey argues the rule prohibiting "continuous associations with felons" is unconstitutional because it is both vague and overbroad. We conclude that whatever deficiencies may exist hypothetically, the rule is constitutional as applied to the facts of Bailey's case.

■ All parties concede government may permissibly place limits on a public employee's constitutionally protected rights which could not be imposed on a private person. (See, e.g., *Unruh* v. *City Council* (1978) 78 Cal.App.3d 18, 23-24 [143 Cal.Rptr. 870]; *Pickering* v. *Board of Education* (1968) 391 U.S. 563, 565 [20 L.Ed.2d 811, 815, 88 S.Ct. 1731].) ■ Further, the unique position occupied by police officers subjects them to an even higher standard of conduct than other employees. (*Unruh* v. *City Council, supra,* 78 Cal.App.3d at pp. 24-25; *Kelly* v. *Johnson* (1976) 425 U.S. 238 [47 L.Ed.2d 708, 96 S.Ct. 1440].) ■ Bailey concedes that a narrowly tailored prohibition enjoining police officers from maintaining close personal relationships with the criminal underside of society would be constitutional. Other courts have recognized such a prohibition validly balances the employee's interest in freely associating against the employer's interests in the efficiency of the public service. (See, e.g., *Dunn* v. *McKinney* (D.C.Wyo. 1985) 622 F.Supp. 259; *Sponick* v. *City of Detroit Police Department* (1973) 49 Mich.App. 162 [211 N.W.2d 674], disapproved on other grounds in *Rinaldi* v. *Civil Serv. Com'n, City of Livonia* (1976) 69 Mich.App.58 [244 N.W.2d 609].)

The dispute lies rather in whether rule 3.3 is sufficiently specific that it gave Bailey "fair notice" of what conduct was prohibited. Bailey claims the proscription against "continuous associations" is void as impermissibly vague because "men of common intelligence must necessarily guess at its meaning" (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]), i.e., as to what level of contacts violates the rule. ■ Persons whose conduct is to be regulated should be given reasonably fair warning of what specific conduct must be avoided. Also, laws should contain definable standards so that persons charged with enforcement are precluded from ad hoc, subjective interpretations which can lead to arbitrary enforcement. (*Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 498 [71 L.Ed.2d 362, 371, 102 S.Ct. 1186].) In short, the "root of the vagueness doctrine is a rough idea of fairness." (*Colten* v. *Kentucky* (1972) 407 U.S. 104, 110 [32 L.Ed.2d 584, 590, 92 S.Ct. 1953].)

A. *Vagueness as Applied*

■ The rule, both on its face and as amplified by Sergeant Darton, is sufficiently specific to give notice to Bailey that maintaining friendships with

felons in general, and with Smith specifically, is prohibited. Bailey claims, however, the rule remains vague even as applied to his conduct, because he did not know how much contact he could maintain with Smith without transgressing the rule against continuous associations. In essence, he argues the term "continuous associations" is ". . . so wholly devoid of objective meaning that it provides no standard *at all* . . . [and hence] we cannot determine whether his conduct is clearly proscribed 'hard core' conduct [citation] because [rule 3.3] is so vague it 'has no core.' [citation]." (*Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 765 [221 Cal.Rptr. 779, 710 P.2d 845].)

We recognize that the phrase "continuous associations or dealings" does not set forth a numerical formula for determining the precise number or frequency of permissible contacts, beyond which an association will be found to be "continuous." However, a statute is not rendered vague by the lack of such precision. Even in cases where First Amendment concerns have subjected allegedly imprecise language to stricter scrutiny, the courts do not impose the formulaic precision which Bailey argues is required. To the contrary, the courts have recognized that because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language. [While] [t]he words of the [statute] are marked by 'flexibility and reasonable breadth, rather than meticulous specificity' [citation], . . . we think it is clear what the [statute] as a whole prohibits." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 110 [33 L.Ed.2d 222, 228-229, 92 S.Ct. 2294].) Although "[t]here might be quibbles about the meaning of [the statutory proscription], . . . there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." (*CSC* v. *Letter Carriers* (1973) 413 U.S. 548, 577-579 [37 L.Ed.2d 796, 816, 93 S.Ct. 2880].)

Rule 3.3 might have ambiguities as applied to hypothetical situations involving borderline conduct; however, it does indeed have a "core" of proscribed conduct (see *Cranston* v. *City of Richmond, supra*, 40 Cal.3d at pp. 765-769, fn. 12 [holding the term "conduct unbecoming" an officer is not facially vague]). It prohibits ongoing personal relationships with felons. (See also *Sponick* v. *City of Detroit Police Department, supra*, 211 N.W.2d 674 [holding rule which proscribed "associating" with known criminals is not void for vagueness because it gives fair warning of proscribed conduct].) The only question is whether Bailey's conduct so clearly fell within the rule's proscription that its application to him was constitutionally permissible. (*Cranston* v. *City of Richmond, supra*, 40 Cal.3d at p. 770.)

■ The rule, on its face and as clarified by Darton's order,[6] required Bailey to disassociate himself from Smith. Both the city council and the trial court concluded Bailey continued his association with Smith despite knowledge of the rule and in violation of Darton's order. Bailey's objective conduct and admitted contacts with Smith and Smith's wife, coupled with his own characterization of his relationship with Smith as a friendship (especially in light of his somewhat recalcitrant attitude in accepting Smith's status as a felon, and his belief Smith had already "paid his debt"), amply justified the finding Bailey had not disassociated himself from Smith.

### B. *Facial Overbreadth - Lack of Standing*

■ Bailey argues rule 3.3 is unconstitutional and cannot be applied to him because it is facially overbroad. As written, Bailey contends the rule could literally apply to a variety of individuals, association with whom by police officers could not or should not be prohibited. For example, Bailey asks, what about the person whose conviction is of ancient vintage and who has been completely rehabilitated? Consider also, Bailey says, the likelihood of some member of a police officer's fraternal organization, church or even political party being a convicted felon. If a member of one's family were to be convicted, Bailey points out, this rule would prohibit familial association.

We reject this position, not because this statute may not in fact be overbroad, but because we find Bailey lacks standing to assert facial overbreadth. ■ "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." (*United States* v. *Mazurie* (1975) 419 U.S. 544, 550 [42 L.Ed.2d 706, 544, 95 S.Ct. 710].) Further, a person to whose conduct a law clearly applies cannot avoid its penalties merely because the statute may be vague or unconstitutionally overbroad when applied to the conduct of others. (*Hoffman Estates* v. *Flipside, Hoffman Estates, supra*, 455 U.S. at p. 495 [71 L.Ed.2d at pp. 369-370]; *Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 610 [37 L.Ed.2d 830, 838-839, 93 S.Ct. 2908].)

■ There exists, however, an exception to this rule which Bailey seeks to invoke. When *First Amendment* concerns are substantially implicated by the challenged statute, the traditional rules of standing are altered to permit

---

[6] Whether a rule gives "fair warning" depends not only upon the wording of the rule itself but also upon the existence of procedures designed to clarify the rule. A rule which contains marginal areas of ambiguity may be corrected by clarification provided by administrative interpretation of the rule. (See, e.g., *CSC* v. *Letter Carriers, supra,* 413 U.S. at p. 580 [37 L.Ed.2d at p. 817].) Here, Darton explained Smith was a felon within rule 3.3's proscription, requiring Bailey to disassociate himself from Smith, except as to contacts legally required by contract.

attacks on overly broad statutes without requiring the litigant to demonstrate his own conduct could not be regulated by a narrowly drawn statute. (*Broadrick* v. *Oklahoma, supra,* 413 U.S. at pp. 611-612 [37 L.Ed.2d at pp. 839-840].) This "narrow exception," which *Broadrick* described as "strong medicine . . . employed . . . sparingly and only as a last resort" (*id.* at p. 613 [37 L.Ed.2d at p. 841]), is rooted in the special solicitude the courts afford to First Amendment values, and reflects the concern that the existence of an overly broad statute directed at activity sheltered by the First Amendment may "chill" protected activity. (See, e.g, *Massachusetts* v. *Oakes* (1989) 491 U.S. 576, 581-582 [105 L.Ed.2d 493, 500-501, 109 S.Ct. 2633].) However, because the overbreadth doctrine is "strong medicine," it has been limited to (and not recognized outside of) the First Amendment context. (See *United States* v. *Salerno* (1987) 481 U.S. 739, 745 [95 L.Ed.2d 697, 707, 107 S.Ct. 2095]; *Lutz* v. *City of York, Pa.* (3d Cir. 1990) 899 F.2d 255.) ■ We must therefore determine whether rule 3.3 so substantially regulates activity sheltered by the First Amendment that, although Bailey's close relationship with Smith is one which could be constitutionally prohibited, Bailey may attack rule 3.3 for its facial overbreadth.

Bailey contends rule 3.3 is directed at, and he was in fact engaged in, activity sheltered by the First Amendment, i.e., the "right to associate" with Smith. Hence, Bailey argues, he has standing to challenge the overbreadth of rule 3.3. Certainly, numerous courts have permitted facial overbreadth challenges to rules which regulated an employee's "associational" rights. (See, e.g., *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589 [17 L.Ed.2d 629, 87 S.Ct. 675]; *United States* v. *Robel* (1967) 389 U.S. 258 [19 L.Ed.2d 508, 88 S.Ct. 419].) However, the talismanic incantation of the term "right of association" does not necessarily trigger First Amendment concerns and its attendant special rules permitting "facial overbreadth" challenges. To the contrary, the analysis contained in recent cases demonstrates there are two different forms of "freedom of association" which enjoy constitutional protections, *only one branch of which falls within the ambit of First Amendment.*

■ "While the First Amendment does not in terms protect a 'right of association,' our cases have recognized that it embraces such a right *in certain circumstances.*" (*Dallas* v. *Stanglin* (1989) 490 U.S. 19, 23-24, [104 L.Ed.2d 18, 25, 109 S.Ct. 1591], italics added.) The court in *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244] described the constitutionally protected "freedom of association" as having two distinct branches—"intimate associational rights" and "expressive associational rights":

"Our decisions have referred to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has

concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State . . . . In this respect, freedom of association receives protection *as a fundamental element of personal liberty.* In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion . . . . [¶] . . . *[T]he nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case."* (*Id.* at pp. 617-618 [82 L.Ed.2d at p. 471], italics added.)

Laws which regulate purely social relationships, at least where the relationships regulated lacked a significant "expressive" component, have not been subjected to First Amendment scrutiny. (See, e.g., *Dallas* v. *Stanglin, supra,* 490 U.S. 19, 23-26 [104 L.Ed.2d 18, 25-26].) The court in *Hvamstad* v. *Suhler* (D.Minn. 1989) 727 F.Supp. 511, after examining both the policy underpinnings for the "overbreadth" doctrine and the distinctions drawn between the two branches of associational rights, concluded:

"Given the limited scope of the overbreadth doctrine and the Supreme Court's analysis of the foundations of the freedom of association, this court concludes that one cannot launch an overbreadth attack based upon the freedom of intimate association . . . . The overbreadth doctrine, in its limited state, cannot . . . be extended to encompass intimate association rights that are based not on first amendment concepts, but on general liberty notions." (*Id.* at p. 517.)

In this case rule 3.3 does not on its face single out "expressive" associations for regulation; rather, it is limited to regulating only "intimate" associations. Nor is there any claim that Bailey's association with Smith, which triggered the application of rule 3.3 to Bailey's conduct, had some significant expressive component. Absent these criteria, First Amendment scrutiny is not applicable to rule 3.3 merely because it could conceivably burden activity sheltered by the First Amendment.[7] (See *Arcara* v. *Cloud Books, Inc.* (1986) 478 U.S. 697 [92 L.Ed.2d 568, 106 S.Ct. 3172].)

At most, rule 3.3 regulates conduct, the protection of which is rooted in Bailey's more generalized "liberty" interests. While a liberty interest is

---

[7] To the extent cases such as *Dunn* v. *McKinney* (D.C.Wyo. 1985) 622 F.Supp. 259 and *Sponick* v. *City of Detroit Police Department, supra,* 211 N.W.2d 674 have assumed that rules proscribing police associations with criminals *must* receive facial scrutiny using First Amendment principles, we believe they are of questionable validity and should not be followed.

protected, it does not enjoy the special solicitude accorded First Amendment concerns, including benefits of the facial overbreadth doctrine. Rule 3.3 is not overbroad as applied to Bailey's conduct, and he lacks standing to raise the complaint of facial overbreadth.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Lim, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied April 11, 1991.

---

* Assigned by the Chairperson of the Judicial Council.