[No. B079842. Second Dist., Div. Three. Dec. 18, 1995.]

RUDOLFO ARELLANES, Plaintiff and Appellant, v.
CIVIL SERVICE COMMISSION OF LOS ANGELES COUNTY et al.,
Defendants and Respondents.

**COUNSEL**

Robert S. Gerstein for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, and Manuel A. Valenzuela, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**KLEIN, P. J.**—Plaintiff and appellant, Rudolfo Arellanes (Arellanes), appeals from the judgment entered following denial of his petition for a writ of mandate to compel the Los Angeles County Civil Service Commission (Commission) to vacate its decision upholding his discharge from the Los Angeles County Sheriff's Department (Department). (Code Civ. Proc., § 1094.5.)

The issues presented are whether Arellanes's discharge must be set aside because it was the product of entrapment or because the rules which governed his conduct were unconstitutionally vague and overbroad.

Since Arellanes was not entrapped and the rules and regulations governing his conduct were neither vague nor overbroad, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The evidence.*

Viewed in the light most favorable to the judgment (*Pittsburgh Unified School Dist.* v. *Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 978 [194 Cal.Rptr. 672]), the evidence established that in March of 1989, Robert Arrand (Arrand) was arrested by United States Secret Service officers in connection with a conspiracy to commit a contract murder. As part of a negotiated plea bargain, Arrand indicated to the prosecutor that one of his coconspirators, Jay Kahyam (Kahyam), had a contact person within the Department named "Rudy" Arellanes. Arrand stated Arellanes had been paid to provide Kahyam with information from the Department's computers for use in an extortion enterprise called " 'the green goods scam.' " As a result of Arrand's statements, authorities began to investigate the green goods scam and a related conspiracy to commit murder. It was then discovered that several other individuals, including a man named Peter Vagenas (Vagenas), were involved in the endeavors.

In April of 1989, Vagenas was arrested for auto theft. In his possession, police officers found a small notebook containing Arellanes's name, work telephone number at the Santa Monica courthouse lockup, and former home telephone number. Vagenas, who had been working as Kahyam's driver and bodyguard, indicated the telephone numbers were those of a friend.

In connection with the green goods scam investigation, police officers executed a search warrant of a safety deposit box held in the names of

Kahyam and Henrietta Khoshro (Khoshro). Found in the safe deposit box was an address book which contained Arellanes's name and telephone number at the Santa Monica lockup.

In view of these events, the sheriff's department's internal criminal investigations unit began an investigation focused on Arellanes, who had been employed as a deputy sheriff since 1978. The investigation initially revealed Arellanes previously had been disciplined. In 1989, Arellanes was suspended for one day for improperly safeguarding persons in his custody and for failing properly to perform his duties. In 1988, Arellanes was suspended from duty for five days for having improper contacts with an inmate informant, James Ruscoe, and making false and misleading statements when questioned about the matter.

With regard to the present matter, the Department's investigators had Arrand contact Arellanes to try to get him to provide information from the Department's computer system. At the direction of an investigator, Arrand telephoned Arellanes at the Santa Monica lockup on the morning of May 5, 1989. Arrand asked for "Rudy," then introduced himself as a friend of Kahyam's and inquired about the whereabouts of Kahyam and Khoshro. When Arrand asked Arellanes if the two men could talk again the next week, Arellanes replied, "Yeah you just call, give me a call."

On May 9, 1989, Arrand telephoned Arellanes and asked whether Arellanes had been able to obtain a telephone number for Khoshro. Arellanes stated he did not have the number and indicated "the only way to get a hold of . . . [Kahyam]" was to write to him or visit him at the county jail. Arrand told Arellanes he had some questions he did not feel comfortable asking on the telephone and asked if the two men could meet. Arellanes then agreed to meet Arrand at a coffee shop the next day.

Twice on the afternoon of May 10, 1989, Arrand spoke with Arellanes on the telephone. The two men arranged to meet at a Bakers Square restaurant in Santa Monica at approximately 7 that evening. At the restaurant, two Department detectives sat nearby as Arrand told Arellanes he needed to get in touch with " 'Henrietta,' " Kahyam's wife. Arrand explained he could not go visit Kahyam at the jail because he, Arrand, had a warrant outstanding for his arrest. When Arrand told Arellanes he had been arrested in San Diego with an associate of Kahyam's, Arellanes indicated he knew the associate. Arrand told Arellanes he had been referred to Arellanes by Kahyam, then said he needed to know whether a man named "Billy Johnson" had a criminal case pending. Arrand indicated Johnson might have been responsible for giving to the Secret Service information which led to Arrand's San

Diego arrest. After Arellanes asked Arrand for Johnson's birthdate and wrote the information down on a piece of paper, Arrand said "he did not know what type of arrangements" Arellanes had with Kahyam, but he "would match them." Arellanes replied he and Kahyam had no "agreement," and he could make Arrand no promises. Finally, Arrand asked Arellanes to "check through the grapevine" to see whether anyone had put out a contract on Arrand's life. Arellanes obtained a telephone number where Arrand could be reached, then left the restaurant.

Arrand telephoned Arellanes on the afternoon of May 17, 1989. When Arrand asked Arellanes whether he had been able to obtain any of the information Arrand had requested, Arellanes said, "No, . . . , I couldn't find a thing." Arrand then asked if the two men could meet again. Arellanes indicated he was "pretty tied up . . . this week," but that Arrand could "catch [him] next week . . . ."

Arrand again telephoned Arellanes on May 30. Arrand asked Arellanes to get him information on two individuals who were acquainted with Kahyam. One man was in "Chino" and one had been taken into custody by West Hollywood police officers two years earlier. Arellanes explained he was unable to get information about inmates at Chino and that an individual arrested two years ago would "be out of the system now[.]" When Arrand asked Arellanes if he could call Arellanes later, Arellanes replied, "Yeah, you can try."

Two weeks later, on June 13, 1989, Arrand twice telephoned Arellanes. During their conversations, Arrand asked Arellanes to assist him by getting information about an individual he was "gonna do." Arrand explained that he needed to determine whether the intended victim was "real and not a phony." Arellanes told Arrand he "no longer ha[d] access to the computers" and that, "unfortunately, . . . there [was nothing he] could do."

Arellanes did not report his telephone conversations, or his meeting with Arrand, to any of his supervising officers.

2. *Arellanes's testimony.*

With regard to his 1988 meeting with informant James Ruscoe, which resulted in his five-day suspension, Arellanes testified he had met Ruscoe while working in the lockup. Arellanes indicated he and Ruscoe had no "outside relationship" and that Ruscoe had "conned" him into coming to visit him at the jail. Arellanes met Kahyam in 1987. As Arellanes stood outside the lockup, Kahyam called out to Arellanes and indicated he was a

friend of Ruscoe's. Arellanes had contact with Kahyam on only one other occasion in 1989, when Kahyam "came through" the lockup.

Arellanes stated he agreed to meet Arrand because he was curious. Arellanes indicated Arrand had not seemed suspicious and that Arrand made no improper requests. Arellanes had not thought his conversations with Arrand required a report, and, even if they had, Arellanes believed his immediate supervisor was "unapproachable."

3. *Procedures.*

In July of 1989, the internal criminal investigations unit determined there was insufficient evidence to criminally prosecute Arellanes for the unauthorized sale of computer information, a violation of Penal Code section 502, and the matter was referred to the Department's internal investigations bureau (Bureau) to determine whether Arellanes had violated rules or procedures set forth in the Department's manual.

Following the Bureau's investigation, the Department notified Arellanes of its intent to terminate his employment on August 17, 1990. As grounds for the termination, the Department indicated Arellanes had violated several sections of the Department's manual of policy and procedures. Arellanes's discharge became effective September 5, 1990. On September 24, 1990, he requested an administrative hearing on the matter.

After a full evidentiary hearing, the hearing officer found Arellanes had previously been suspended for "prohibited association;" that Arellanes failed to discourage Arrand's telephone calls and inquiries; that Arellanes met Arrand in person and, during the meeting, Arrand "declared he had been arrested[,] . . . requested information . . . about another alleged criminal, a potential hit," and asked Arellanes if he could pay Arellanes for additional information; and that Arellanes failed to report the meeting to his supervisors. The hearing officer found the Department had met its burden of proof in establishing Arellanes violated departmental rules and policies "by prohibited association[s] and failure to report to [his supervisors]." In conclusion, the hearing officer recommended the discharge be sustained.

The Commission adopted the hearing officer's recommendation, and Arellanes sought review of the decision by filing a petition for writ of mandate in the superior court. On July 28, 1993, the court denied the petition after finding the evidence "support[ed] the Commission's findings that [Arellanes] participated in prohibited associations and failed to report the associations and other information and incidents as required by provisions of [the]

Sheriff's Manual of Policy and Procedures," and the "evidence supporting the determination that [Arellanes] failed to report information and incidents, including an off-duty meeting with an individual seeking unlawful access to Sheriff Department information [was] a sufficient and independent ground for discharge." The Commission indicated: "Such action creates a situation whereby a deputy sheriff forfeits the trust of his department and the public." This appeal followed.

## CONTENTIONS

Arellanes contends his discharge must be set aside because (1) it was the product of entrapment; and (2) the rules which governed his conduct are vague and overbroad.

## DISCUSSION[1]

### 1. *Arellanes's discharge was not the product of entrapment.*

■ Arellanes contends his discharge was improper because it was the product of entrapment. We disagree.

■ It has been held entrapment may be asserted as a defense in administrative proceedings. (*Patty* v. *Board of Medical Examiners* (1973) 9 Cal.3d 356, 362 [107 Cal.Rptr. 473, 508 P.2d 1121, 61 A.L.R.3d 342].) In California, the " 'proper test of entrapment [is whether] the conduct of the law enforcement agent [was] likely to induce a normally law-abiding person to commit the [improper conduct.]' " (*People* v. *Lee* (1990) 219 Cal.App.3d 829, 835 [268 Cal.Rptr. 595], quoting *People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947].) Official conduct which does no more than offer the opportunity to act improperly is permissible; "but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the [improper acts]." (*Id.* at p. 690.) The inquiry is to focus primarily on the conduct of the law enforcement agent. Such matters as "the character of the

---

[1]We note the "appellate court's function, in reviewing determinations made by the superior court in its 'independent judgment' review of an administrative agency decision, is to apply the substantial evidence test to factual findings. Factual determinations by the trial court will be upheld if substantial evidence, gleaned from the administrative record, supports them. [Citations.] The trial court's determinations of issues of law, however, are fully reviewable by this court, and we are bound neither by the preliminary resolution of same by the [administrative agency] nor by the subsequent trial court decision. [Citations.]" (*Imperial Irrigation Dist.* v. *State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 553 [275 Cal.Rptr. 250].)

suspect, his predisposition to commit the offense, and his subjective intent are irrelevant." (*Id.* at pp. 690-691.)

In the present case, Arellanes's claim he was badgered and cajoled into meeting and talking with Arrand is without merit. A review of the record indicates, although the conversations between the two men were initiated by Arrand, Arrand was neither overbearing nor overly aggressive. In addition, at no time did Arrand offer Arellanes exorbitant consideration or make improper appeals to Arellanes's sense of friendship or sympathy. (See *People* v. *Barraza*, *supra*, 23 Cal.3d at p. 690.) In short, Arrand did nothing more than provide Arellanes with the opportunity to act improperly. There was no entrapment.

2. *The rules which governed Arellanes's conduct are neither vague nor overbroad.*

Arellanes was found to have violated four departmental rules: rule 3-01/030.05, which indicates a deputy shall not act in such a manner so "as to bring discredit upon himself or the Department;" rule 3-01/040.75, which directs a deputy to "promptly report to his immediate supervisor any information or incident coming to his attention that might indicate the need for Departmental actions;" rule 3-01/050.10, which indicates a deputy shall "maintain sufficient competency to properly perform [his or her] duties;" and rule 3-01/050.77, which indicates a deputy "shall not knowingly maintain a personal association with persons who are under criminal investigation or indictment and/or who have an open and notorious reputation in the community for criminal activity, where such association would be detrimental to the image of the Department." Arellanes urges his discharge must be set aside because none of the above rules sufficiently warned him his failure to discourage Arrand, or to report his contact with Arrand to a superior, could result in disciplinary proceedings or termination. The contention is without merit.

Rules and "statutes must be sufficiently clear as to give a fair warning of the conduct prohibited . . . ." (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].) This prohibition against vagueness has been held to extend to administrative regulations affecting conditions of governmental employment. (*Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 763-764 [221 Cal.Rptr. 779, 710 P.2d 845].)

Arellanes initially urges the Department's rules infringe upon his First Amendment right of freedom of association. He asserts the rules "chill"

protected First Amendment activity and, under these circumstances, we must consider whether they are overbroad on their face.

■ It has been determined that not all forms of "association" are protected by the First Amendment. Choices to enter into and maintain certain "intimate" interpersonal relationships are protected, not by the First Amendment, but as fundamental elements of personal liberty. On the other hand, the right to associate for the purpose of engaging in activities protected by the First Amendment, i.e., assembly or the exercise of a religious preference, are protected by the First Amendment and, as such, subject to First Amendment scrutiny. (*Bailey* v. *City of National City* (1991) 226 Cal.App.3d 1319, 1331-1332 [277 Cal.Rptr. 427].)

The rules cited by Arellanes do not, on their face, limit activities protected by the First Amendment. At most, they address Arellanes's ability to maintain "intimate," interpersonal relationships. Moreover, Arellanes does not claim his relationships with Arrand and others, which triggered the application of the department's rules, had some "significant 'expressive' [First Amendment] component." (*Bailey* v. *City of National City, supra*, 226 Cal.App.3d at p. 1332.) Under these circumstances, Arellanes may not complain the rules are facially overbroad.

Arellanes next argues the rules are impermissibly vague as applied to his particular conduct. ■ " '[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.' [Citations.]" (*Cranston* v. *City of Richmond, supra*, 40 Cal.3d at p. 764.) " '[O]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness.' " (*Ibid.*)

Arellanes asserts rule 3-01/050.77 failed to warn him his contacts with Arrand would qualify as the "maint[enance of] a personal association" or that Arrand was the type of person referred to as one "under criminal investigation or indictment" or who had "an open and notorious reputation in the community for criminal activity." We disagree.

Rule 3-01/050.77 is concerned with associations, "where such association would be detrimental to the image of the Department." This phrase, read in conjunction with the balance of the rule, provides a "sufficiently specific standard against which the conduct of a police officer . . . can be judged. Police officers . . . will normally be able to determine what kind of conduct [will be detrimental to the image of the Department]." (*Cranston* v. *City of Richmond, supra*, 40 Cal.3d at p. 769.)

Here, Arellanes knew Arrand was associated with Kahyam, a man known by Arellanes to have a criminal record. When Arrand inquired about the

whereabouts of some of Kahyam's associates, Arellanes should have been aware that a continued association could be improper. Arellanes, however, chose to meet Arrand in person at a coffee shop. During their meeting, Arrand indicated he had a warrant outstanding for his arrest and that he had been previously arrested with an associate of Kahyam's. Arrand then asked Arellanes for information about an individual who appeared to have been an informant and, finally, asked Arellanes to determine whether anyone had put out a contract on Arrand's life. The conversation during this meeting surely should have indicated to Arellanes that his continued association with Arrand likely would be detrimental to the image of the Department. However, Arellanes continued to speak with Arrand on the telephone and, at one point, told Arrand to call him back the following week. There can be no doubt Arellanes behavior constituted conduct clearly proscribed by rule 3-01/050.77.

■ Arellanes also claims rule 3-01/040.75 failed to apprise him of his duty to report his contacts with Arrand to a supervising officer. Rule 3-01/040.75 provides a deputy must promptly report "any information or incident coming to his attention that might indicate the need for Departmental actions." A police officer normally should be able to determine what kind of communications might indicate the need for departmental action. (See *Cranston* v. *City of Richmond, supra,* 40 Cal.3d at p. 769.) Here, Arrand asked Arellanes for information about an informant and inquired about the existence of a contract for murder. If such inquiries do not fall within the category of communications which might indicate the need for official departmental attention, it is difficult to imagine what communications would.

### DISPOSITION

The judgment is affirmed. Arellanes to bear costs of appeal.

Kitching, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 20, 1996.