Filed 9/30/21  Watson v. Long Beach Civil Service Com. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| MAURY WATSON, Plaintiff and Appellant, v. LONG BEACH CIVIL SERVICE COMMISSION, Defendant and Respondent; CITY OF LONG BEACH et al., Real Parties in Interest and Respondents. | B307558 (Los Angeles County Super. Ct. No. 19STCP00126) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Robert Lucas Law, Robert W. Lucas; Phillips & Rickards and Wendell Phillips, for Plaintiff and Appellant.

Charles Parkin, City Attorney, Gary J. Anderson, Principal Deputy City Attorney, and Monica J. Kilaita, Deputy City Attorney, for Defendant, Real Parties in Interest, and Respondents.

_____

Real party in interest and respondent City of Long Beach (the City) employed plaintiff and appellant Maury Watson (Watson) as a refuse operator.  While on duty on March 10, 2017, Watson struck the windshield of another refuse truck with his hand after he became upset at a coworker, thereby cracking the windshield.  The coworker reported the incident to City officials, and an investigator employed by the City interviewed the coworker regarding the incident on March 13, 2017.

Later that day, the City summarily suspended Watson in a letter signed by real party in interest and respondent Diko Melkonian, manager of the Environmental Services Bureau for the City (Melkonian).  In so doing, the City invoked a rule authorizing it to suspend an employee for an accusation involving "substantiated, job-related, extraordinary conduct requiring immediate removal of the employee from the workplace" pending an investigation for a period not to exceed 30 business days.  The rule provided that if the City did not file charges against the employee within that 30-business-day-period, the summary suspension had to be with pay.

On the last day of the suspension period authorized by that rule—i.e., April 24, 2017—the City served on Watson a letter signed by Melkonian and Russ Ficker, personnel officer for the City's Department of Public Works (Ficker), which notified him the City intended to terminate his employment based on certain charges of misconduct, including his behavior during the

2

March 10, 2017 incident.  The letter advised Watson that he may attend a hearing at which he could respond to the charges and explain why he should not be discharged.  At the hearing held on May 31, 2017, Melkonian, Ficker, and another City official were members of the hearing panel.  Shortly after the hearing, the City discharged Watson from his employment in a letter signed by real party in interest and respondent Patrick H. West, city manager (West).  The termination was deemed effective as of March 14, 2017, meaning that Watson was not paid from that date onward.  Watson appealed the decision to defendant and respondent Long Beach Civil Service Commission (the Commission), which ultimately upheld the dismissal.[1]

Watson filed a petition for administrative writ of mandate, claiming that the rule the City used to suspend him was unconstitutional on its face and as applied to him because it did not afford him with sufficient predeprivation notice and an opportunity to heard, and that Ficker's and Melkonian's participation in the May 31, 2017 hearing violated Watson's right to due process.  The trial court denied the petition.

On appeal of the trial court's ruling, Watson once again raises facial and as-applied challenges to the suspension rule and complains of Ficker's and Melkonian's involvement in the hearing preceding his discharge from employment.  He also claims that the rule is unconstitutionally vague.

We conclude that Watson's vagueness challenge fails because when the suspension rule is read in conjunction with the dictionary definition of "substantiated" and the City's policy

---

[1] We refer to the City, Melkonian, West, and the Commission collectively as "respondents."

3

prohibiting threats of violence, it is apparent the rule authorized Watson's summary suspension.

Watson's facial due process challenge fails because he does not rebut the trial court's presumptively correct reasoning for rejecting that claim, and he otherwise fails to demonstrate the rule is unconstitutional in the generality or great majority of cases.

His as-applied challenge fails because Watson did not (1) develop adequately the factual basis for his claim that he was deprived of sufficient process for 12 weeks; (2) show the City was obligated to hire an independent third-party to investigate the March 10, 2017 incident before suspending him; or (3) establish that due process required the City to place him on paid leave during its investigation.

Finally, Ficker's and Melkonian's involvement in the initiation of the disciplinary process, without more, does not establish they lacked impartiality.

Finding no error, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

We summarize only those facts that are relevant to this appeal.

Watson was employed by the City as a refuse operator I for the City's Department of Environmental Services Bureau. On February 1, 2017, Watson got into an argument with a coworker.

---

[2] Our factual and procedural background is derived in part from undisputed aspects of the trial court's ruling on Watson's writ petition. (See *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 349, fn. 2 [utilizing the summary of facts provided in the trial court's ruling].)

During the argument, Watson allegedly " 'grabbed his genitalia and made discourteous remarks to other employees instructing them to look at his genitalia.' " On Friday, March 10, 2017, Watson struck the windshield of a City refuse truck with his hand after he became upset with a coworker, thereby cracking the windshield.

On Monday, March 13, 2017, the City's investigator, Thomas Marshall (Marshall), conducted an initial investigation into the March 10th incident. During that initial investigation, Marshall interviewed the coworker "who was the focus of [Watson's] anger," and prepared an incident investigation form. Later that day, through a letter signed by Melkonian, the City summarily suspended Watson from his position without pay, effective immediately, pending an investigation of Watson's alleged violation of the City's Workplace Threats and Violence Policy.[3]

Melkonian's letter stated the City suspended Watson pursuant to article VII, section 87 of the Civil Service Rules and Regulations (Section 87), which provides: "Pending an investigation by the appointing authority of accusations against an employee involving misappropriation of City property and/or City funds, drug addiction, brutality or cruelty to a person in custody, acts which would constitute a felony, or a misdemeanor involving moral turpitude, *or substantiated, job-related, extraordinary conduct requiring immediate removal of the employee from the workplace*; the appointing authority may impose a summary suspension for a period not to exceed

---

[3] Because "the City fully paid [Watson] through his partial workday on March 13, 2017," his "first day of suspension was Tuesday, March 14, 2017."

30 days.[4]  Any summary suspension may be terminated by the appointing authority by giving 48 hours notice in writing to the employee.  The summary suspension period shall be used by the appointing authority to expeditiously complete an administrative investigation of the incident and/or circumstances which caused the disciplinary action to be taken.  If the appointing authority does not file charges against the employee on or before the expiration date of the summary suspension then the summary suspension shall be with pay.  However, if charges are filed against the employee on or before the summary suspension is terminated, the effective date of the discipline may be made retroactive to any date on or after the date the employee was summarily suspended.  Time served or salary lost under a summary suspension may be considered in any final penalty assessed against the employee."  (Italics added.)

At some point after the City summarily suspended Watson, but prior to the filing of charges against him, the City hired an independent investigator to conduct an investigation of the March 10, 2017 event.

In a signed letter dated April 20, 2017, Melkonian and Ficker advised Watson that the City was considering terminating Watson's employment.  After failed attempts at personal service, the City caused the notice to be delivered to Watson on April 24, 2017 by certified mail.  The notice alleged eight charges of misconduct by Watson arising out of the February 1, 2017 and March 10, 2017 incidents, including a violation of the City's Workplace Threats and Violence Policy.  The notice advised

---

**4**  The City's civil service rules, including Section 87, define "days" as business days and not calendar days.

6

Watson that he would be provided with an opportunity to respond fully to the charges and explain why the City should not terminate his employment.

On May 31, 2017, the City conducted a *Skelly* hearing.[5] Melkonian; Ficker; and Malcolm Oscarson, manager of the City's Business Operations Bureau; acted as members of the *Skelly* hearing panel. In a letter dated June 7, 2017 that was signed by West, the City discharged Watson from his position. In the letter, the City deemed Watson's discharge to be "effective March 14, 2017."

On June 18, 2017, Watson appealed his termination to the Commission. On September 12 and 19, and October 3, 2018, the Commission heard Watson's discharge matter. During the Commission hearing, Watson filed a motion asserting that the City violated his due process rights by summarily suspending him without pay and by not having a reasonably impartial *Skelly* hearing panel. At the conclusion of the hearing on October 3, 2018, the Commission denied Watson's motion and upheld his termination after sustaining six of the eight misconduct charges made against Watson.[6]

_____

[5] As explained in greater detail in Discussion, part C, *post*, a *Skelly* hearing is an administrative procedure in which a public employee has an opportunity to respond to charges leveled against him or her.

[6] The Commission did not sustain two charges against Watson that alleged he was "dishonest" in certain respects during his April 7, 2017 interview with the independent investigator. The Commission sustained the remainder of the charges against Watson concerning the February 1, 2017 and March 10, 2017 incidents, including the allegation that on March 10, 2017, Watson "displayed loud and angry behavior toward another

7

On January 9, 2019, Watson initiated the trial court proceedings by filing a petition for writ of mandate. On February 28, 2019, Watson filed the operative first amended petition for writ of administrative mandamus and complaint for injunctive relief, declaratory relief, and "[v]iolation of 42 U.S.C. § 1983" against respondents. Simply summarized, Watson "challenge[d] the decision of [the City] . . . to summarily suspend [Watson] without pay (1) prior to giving him an opportunity to be heard and thereafter (2) conducting [the] *Skelly* hearing before biased adjudicators—individuals involved in 'factual determinations leading to [Watson's] summary suspension so that they were not reasonably impartial' "—i.e., Ficker and Melkonian. (Fn. omitted.) Watson did not challenge the Commission's decision on the merits of the charges during the writ proceedings, and he does not do so on appeal.

After the parties submitted briefing on Watson's writ petition, the trial court heard the petition on July 15, 2020. At the hearing, the trial court accepted the parties' concession that if the court were to deny Watson's writ petition, then all of Watson's other claims would fail because they are derivative of that cause of action.[7]

On July 16, 2020, the trial court issued a ruling denying the petition for writ of mandate. As an initial matter, the court agreed with Watson that his unpaid suspension constituted a deprivation of a property interest that entitled him to due process. The trial court rejected Watson's argument that

employee . . . by striking the windshield of [a City] vehicle [the other employee] was operating, causing the windshield to crack."

[7] Watson does not retract that concession on appeal.

8

Section 87, on its face, violates state and federal guarantees to due process of law by failing to provide adequate notice and an opportunity to be heard before authorizing a suspension without pay.  The court reasoned Section 87 "strikes an appropriate balance between the employee['s] property right to his/her livelihood and the City's need to protect other employees in the workplace, the public and its property under certain emergent conditions."

The court further concluded that Watson failed to show that the City unconstitutionally applied Section 87 to him.  The court observed that Watson's as-applied challenge rested solely on three assertions, each of which the court rejected—Watson was "entitled to a full and complete report of the allegations of his misconduct prior to his immediate suspension[, the] facts did not support a summary suspension under Section 87," and the City violated Section 87 by suspending Watson for longer than 30 days before filing charges against him.[8]  Lastly, the court rejected Watson's claim that inclusion of Melkonian and Ficker on the *Skelly* panel deprived him of reasonably impartial, noninvolved decision-makers.

On July 31, 2020, the trial court entered judgment denying Watson's writ petition pursuant to the July 16, 2020 ruling. Watson timely appealed the judgment.

---

[8] On appeal, Watson explicitly abandons his argument that the City violated Section 87 by "waiting too long after the summary suspension to institute termination proceedings." Specifically, Watson states he "does not pursue that argument on appeal because he concedes the City's point that the rules only require the counting of business days, excluding weekends and holidays, not calendar days . . . ."

9

## STANDARD OF REVIEW

"[I]n mandamus proceedings arising from public employment administrative hearings[,] . . . [¶] '[t]he trial court [is] required to exercise its independent judgment of the evidence before the [agency]. [Citation.] In so acting the trial court ha[s] the power to make credibility findings. . . . [¶] . . . [¶] "The trial court should . . . beg[in] with a strong presumption that the [agency's] decision was correct, and place[ ] on [appellant] the *burden of proof* to show that the decision was against the weight of the evidence. [Citation.]" ' " (See *Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 179 (*Thornbrough*).) " 'Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings. . . . [T]here is no inconsistency in a rule requiring that a trial court begin its review with a presumption of the correctness of administrative findings, and then, after affording the respect due to these findings, exercise independent judgment in making its own findings.' [Citation.]" (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1141 (*San Diego Unified School Dist.*).)

On appeal from a judgment denying a petition for writ of mandate, " '[w]e must sustain the trial court's findings if they are supported by substantial evidence. [Citation.] In reviewing the evidence, we resolve all conflicts in favor of the party prevailing at the trial court level and must give that party the benefit of every reasonable inference in support of the judgment.' " (See *San Diego Unified School Dist.*, *supra*, 214 Cal.App.4th at pp. 1142–1143.) "However, 'we make an independent review of

10

any questions of law necessary to the resolution of this matter on appeal' [citation], including the interpretation of rules of law, and whether the procedures comported with due process [citation]." (*Thornbrough, supra,* 223 Cal.App.4th at p. 179.)  Further, "the trial court's judgment is presumed correct" and "the appellant bears the burden to affirmatively demonstrate error . . . ."  (See *Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512–514 (*Shenouda*).)  The appellant bears the burden of rebutting this presumption of correctness, regardless of the applicable standard of review.  (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

## DISCUSSION

"A constitutional challenge to a statute, ordinance or policy may be facial or as-applied."  (*Sturgeon v. Bratton* (2009) 174 Cal.App.4th 1407, 1418.)  "We evaluate the merits of a facial challenge by considering 'only the text of the measure itself, not its application to the particular circumstances of an individual.' [Citation.]"  (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 38–39 (*Zuckerman*).)  To prevail on a facial challenge, the party contesting the provision must at the very least "establish that [it] is unconstitutional ' "in the generality or great majority of cases." [Citations.]' [Citations.]" (See *420 Caregivers, LLC v. City of Los Angeles* (2012) 219 Cal.App.4th 1316, 1334–1335 (*420 Caregivers, LLC*); *ibid.* [noting that our Supreme Court has articulated two different tests governing facial challenges, and that the aforementioned " ' "in the generality or great majority of cases" ' " test is "the more lenient" of the two].)  "Unlike a facial challenge to the constitutional validity of a rule that considers only the text of the measure itself, an applied challenge looks to the particular

11

circumstances of its application to a specific individual" to determine " 'whether . . . the application deprived the individual to whom it was applied of a protected right.' [Citation.]" (See *Lammers v. Superior Court* (2000) 83 Cal.App.4th 1309, 1328–1329 (*Lammers*).)

Watson contends that Section 87 is unconstitutional on its face because its terms are too vague. Watson also levels facial and as-applied procedural due process challenges to Section 87, because Section 87 does not require the City to provide notice and an opportunity to be heard before suspending a permanent employee, and the City violated Watson's procedural due process rights in the manner in which it summarily suspended him. Lastly, Watson maintains the City violated his procedural due process rights by allowing Ficker and Melkonian to serve as decision-makers at Watson's *Skelly* hearing. Each of these claims fails.

## A. We Reject Watson's Vagueness Claim Because the Dictionary and the City's Written Policy on Workplace Threats and Violence Demonstrate that Section 87 Readily Applies to the Instant Case

"Because the constitutional guarantee of due process generally secures the right to notice and the opportunity to be heard [citation], a law is unconstitutionally vague only [if it] fails to ' "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" ' or to know 'what conduct on [his or her] part will render [him or her] liable to [the law's] penalties.' [Citations.]" (*Diaz v. Grill Concepts Services, Inc.* (2018) 23 Cal.App.5th 859, 870 (*Diaz*), second bracketed insertion added.) "This prohibition against vagueness has been held to extend to administrative regulations affecting conditions

12

of governmental employment. [Citation.]" (*Arellanes v. Civil Serv. Com.* (1995) 41 Cal.App.4th 1208, 1216 (*Arellanes*).) A vagueness challenge will fail if the meaning of the language at issue "can be fairly ascertained by reference to other sources, such as dictionary definitions, similar statutes, the common law, judicial decisions" (see *Ivory Education Institute v. Department of Fish & Wildlife* (2018) 28 Cal.App.5th 975, 982), "regulations, legislative history, . . . legal treatises, [or] legal dictionaries . . . ." (See *Diaz, supra*, 23 Cal.App.5th at pp. 870–871.) The touchstone of a vagueness inquiry is whether " ' "any reasonable and practical construction can be given [to the] language." ' [Citation.]" (See *Ivory Education Institute*, at p. 982.)

Watson contends that Section 87 is unconstitutionally vague because "[n]either the civil service rules themselves nor the City provide any working definition of 'substantiated,' 'immediate' or 'extraordinary job-related conduct.' " As a consequence, Watson maintains that the portion of Section 87 allowing for summary suspension based on " 'substantiated, job-related, extraordinary conduct requiring immediate removal of the employee from the workplace' " "is so vague and amorphous as to make it unintelligible and subject to the whim of the City."

" ' "[V]agueness challenges . . . which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." [Citations.]' [Citation.]" (See *Arellanes, supra*, 41 Cal.App.4th at p. 1217.) Under this approach, a facial vagueness challenge will fail if "the bulk of the alleged conduct 'readily f[alls]' within the scope" of the regulation, even if the application of the provision in question to such conduct is not "perfectly clear . . . ." (See *People v. Superior Court (J.C. Penney Corp., Inc.)* (2019) 34 Cal.App.5th 376, 385–386, 401–402

13

(*J.C. Penney Corp., Inc.*).)  Because Watson does not contend that Section 87 implicates First Amendment freedoms, his vagueness challenge cannot succeed if his alleged misconduct readily falls within the scope of Section 87.

As respondents point out, the term "substantiated" is defined by Merriam-Webster's Dictionary as "to establish by proof or competent evidence."  ("Substantiated," *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/substantiated (as of Sept. 27, 2021), archived at <https://perma.cc/ZX83-Q8JY>.)[9]  Furthermore, although respondents do not claim the City's policies explicitly define "job-related, extraordinary conduct requiring immediate removal of the employee from the workplace," they do assert "the City has other policies which discuss types of behavior that will not be tolerated in the workplace . . . ."

Specifically, the City's Workplace Threats and Violence Policy No. 7.9 (Policy No. 7.9) provides that "[t]hreats, threatening behavior, or acts of violence against employees . . . by anyone on City property *will not be tolerated*" and "[v]iolations of this policy by City employees *will lead* to disciplinary action, up to and including termination . . . ."  (Italics added.)  The policy further defines "threats and violent behavior" as, inter alia, "[t]he actual or implied threat of harm to an individual"; "[l]oud, disruptive or angry behavior or language which is clearly not part of the typical work environment"; "[w]illful destruction of City . . .

---

**9** We, sua sponte, take judicial notice of this dictionary definition of "substantiated."  (See *Golden Security Thrift & Loan Assn. v. First American Title Ins. Co.* (1997) 53 Cal.App.4th 250, 256 [indicating an appellate court may take judicial notice of "various dictionary definitions" of a term].)

property"; and "[a]ny other act that a reasonable person would perceive as constituting a threat of violence."

Because the City has declared it will not tolerate an employee's threatening behavior or acts of violence while on duty, a " ' "person of ordinary intelligence" ' " would understand that a violation of Policy No. 7.9 constitutes job-related, extraordinary conduct requiring immediate removal from the workplace. (See *Diaz, supra*, 23 Cal.App.5th at p. 870.) We have no difficulty concluding the City accused Watson of misconduct proscribed by Policy No. 7.9. The administrative record shows that a coworker reported to the City that Watson yelled at the coworker "and hit [the] truck windshield [of the cabin of a City vehicle containing the coworker] with the hand and broke it," and that the coworker "turned [his] face to [his] left side because [he] thought [that Watson] was going to hit [the coworker] . . . ." (Some capitalization omitted.) This misconduct amounts to "[l]oud, disruptive, or angry behavior which is clearly not part of the typical work environment"; "[w]illful destruction of City . . . property"; and behavior that "a reasonable person would perceive as constituting a threat of violence."

Furthermore, the City substantiated this alleged job-related extraordinary conduct before it suspended Watson. The trial court found that on March 13, 2017, "Marshall[ ] began and completed his initial investigation into the March 10 incident . . . ." The court found that in undertaking this initial investigation, Marshall "interviewed the employee who was the focus of [Watson's] anger," and prepared an incident investigation form indicating the coworker reiterated his account of the March 10, 2017 incident during that interview. The lower court observed that Marshall conducted this initial investigation

15

"before [Watson] was summarily suspended pursuant to Section 87."

Notwithstanding the trial court's findings, Watson appears to argue that at the time the City summarily suspended him, his alleged violation of Policy No. 7.9 had not been "substantiated." Watson asserts that Ficker decided to suspend him summarily based on an e-mail Ficker received on March 13, 2017 from the general superintendent for refuse operations, which indicated that "someone had claimed Watson had cracked a windshield."

Yet, in the excerpt of Ficker's testimony cited by Watson regarding this e-mail, Ficker stated *he did not recall* whether the incident investigation form or any photographs depicting the windshield were attached to the e-mail, nor did he recall the specific contents of the e-mail. Moreover, Watson does not direct us to any part of the record containing the e-mail, nor is it apparent that this e-mail is in the voluminous appellate record.

Thus, Watson has failed to overcome the presumption of correctness afforded to the trial court's finding that the City interviewed the coworker and relied upon that individual's statements when it decided to summarily suspend Watson. (See *Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 787 [" ' "A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." ' [Citation.]"].) Furthermore, Watson does not argue that Marshall's investigation fell short of substantiating the allegations against Watson concerning the March 10, 2017 incident.

In sum, because we conclude that this case " 'readily f[alls]' within the scope" of Section 87, Watson cannot " ' "successfully challenge it for vagueness." ' "[10]  (See *J.C. Penney Corp., Inc.*, *supra*, 34 Cal.App.5th at p. 401; *Arellanes*, *supra*, 41 Cal.App.4th at p. 1217.)

**B.    We Reject Watson's Facial and As-Applied Procedural Due Process Challenges to Section 87**

"Both the federal and state Constitutions compel the government to afford persons due process before depriving them of any property interest.  [Citations.]  In light of the virtually identical language of the federal and state guarantees, we have looked to the United States Supreme Court's precedents for guidance in interpreting the contours of our own due process clause and have treated the state clause's prescriptions as substantially overlapping those of the federal Constitution.  [Citation.]" (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212 (*Today's Fresh Start, Inc.*), citing, inter alia, U.S. Const., 14th Amend. & Cal. Const., art. I, § 7, subd. (a).)

     " 'The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in "property" or "liberty."  [Citations.]  Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process.'  [Citations.]" (*Today's Fresh Start, Inc.*, *supra*, 57 Cal.4th at p. 214.)  The

---

**10** Given our disposition of Watson's vagueness challenge on the merits, we do not address the City's argument that Watson waived this claim by failing to raise it in his mandamus petition.

parties do not challenge the trial court's conclusion that Watson's "unpaid suspension constitutes a government deprivation of his property interest which entitled him to due process." Because " 'it [has been] determined that the Due Process Clause applies, "the question remains what process is due." ' [Citations.]" (See *Today's Fresh Start, Inc.*, *supra*, 57 Cal.4th at p. 214.)

" 'The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." ' [Citations.] The opportunity to be heard must be afforded 'at a meaningful time and in a meaningful manner.' [Citations.]" . . . [¶] . . . " ' "Because of the broad spectrum of concerns to which the term [due process] must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." ' [Citation.]" (*Today's Fresh Start, Inc.*, *supra*, 57 Cal.4th at pp. 212–213.)

Our high court has "adopted the *Mathews[v. Eldridge* (1976) 424 U.S. 319] balancing test as the default framework for analyzing challenges to the sufficiency of proceedings under our own due process clause." (See *Today's Fresh Start, Inc.*, *supra*, 57 Cal.4th at p. 213.) Under that framework, we "balanc[e] three considerations: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' [Citations.]" (*Today's Fresh Start, Inc.*, at p. 213, quoting

18

*Mathews, supra*, 424 U.S. at p. 335.) "In addition, we may also consider a fourth factor, ' "the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." ' [Citations.]" (*Today's Fresh Start, Inc.*, at p. 213.) That factor focuses on whether the government has " ' "treat[ed an individual] as *a nonperson*, an object, rather than a respected, participating citizen." [Citation.]' "[11] (See *Today's Fresh Start, Inc.*, at p. 213.)

First, we turn to Watson's assertion that Section 87 is unconstitutional on its face because it does not afford sufficient process to employees suspended under that rule. Next, we assess Watson's claim that as applied to his case, Section 87 violated his due process rights.

1. *Watson fails to overcome the presumption of correctness accorded to the trial court's rejection of his facial due process challenge to Section 87*

Watson contends that Section 87 "violates due process rights of permanent employees" because it "allows the City to remove a permanent employee from its payroll without even notifying the employee of the allegations and allowing the employee to present [that person's] side of the story."

---

[11] Watson discusses this "dignitary interest" consideration only in connection with his as-applied challenge to Section 87. We thus do not address whether this factor supports his facial challenge to the rule. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' [Citations.]"].)

*Gilbert v. Homar* (1997) 520 U.S. 924, is instructive, given that it considered "whether a State violates the Due Process Clause of the Fourteenth Amendment by failing to provide notice and a hearing before suspending a tenured public employee without pay." (See *id.* at p. 926.) There, a public university summarily suspended one of its police officers upon being notified that he had been arrested and charged with possession of marijuana, possession with the intent to deliver, and criminal conspiracy to violate the controlled substance law, which was a felony. (See *id.* at pp. 926–927.) Approximately three weeks after the suspension began and about two and half weeks after the criminal charges were dismissed, university officials "met with [the officer] to give him an opportunity to tell his side of the story." (See *id.* at p. 927.) About five days after that meeting, the university notified the police officer in a letter that he was being demoted to the position of groundskeeper effective the next day and that he would receive backpay at the rate of pay of a groundskeeper, although he later secured backpay at the rate of pay for a police officer. (See *ibid.*) The officer filed suit under title 42 United States Code section 1983 against university officials, asserting that their "failure to provide him with notice and an opportunity to be heard before suspending him without pay violated due process." (*Gilbert*, at p. 928.)

*Gilbert* observed that the high court had previously " 'rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property[,]' " and acknowledged that "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." (See *Gilbert, supra,*

20

520 U.S. at p. 930.)  *Gilbert* noted that in a prior case, the high court stated:  " 'An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.'  [Citation.]"  (See *id.* at pp. 930–931, quoting *FDIC v. Mallen* (1988) 486 U.S. 230, 240 (*Mallen*).)

The *Gilbert* court then utilized the *Mathews* test to determine whether the federal due process clause obligated university officials to provide the officer with notice and an opportunity to be heard before they suspended him.  (See *Gilbert, supra*, 520 U.S. at pp. 926, 931–935.)  In assessing the officer's private interest, the *Gilbert* court stated, "[A]ccount must be taken of 'the *length*' and '*finality* of the deprivation,' " and the court held that "[s]o long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all . . . ."[12]  (See *Gilbert*, at p. 932.)

The high court found that "[o]n the other side of the balance, the State has a significant interest in immediately suspending, when felony charges are filed against them,

---

[12]  The *Gilbert* court did not resolve "[w]hether [the officer] was provided an adequately prompt *post*-suspension hearing . . . ."  (See *Gilbert, supra*, 520 U.S. at pp. 935–936.)  The high court found that this question was "separate" from whether university officials were obligated to provide the officer with a presuspension notice and opportunity to be heard, and remanded the case to allow the circuit court of appeals to examine the adequacy of the postsuspension process in the first instance.  (See *id.* at pp. 926, 935–936.)

employees who occupy positions of great public trust and high public visibility, such as police officers." (See *Gilbert, supra,* 520 U.S. at 932.) *Gilbert* also held that "the government does not have to give an employee charged with a felony a paid leave at taxpayer expense," and that "the Constitution does not require the government to bear the added expense of hiring a replacement while still paying [an employee charged with a felony]." (See *ibid.*) Lastly, the court concluded that "the risk of erroneous deprivation and the likely value of additional procedures" factor did not require any predeprivation process. (See *id.* at pp. 933–934.) Specifically, *Gilbert* reasoned that "the purpose of any pre-*suspension* hearing would be to assure that there are reasonable grounds to support the suspension without pay," and "the arrest and the filing of charges" had "already . . . assured" such reasonable grounds existed because "an independent third party has determined that there is probable cause to believe the employee committed a serious crime." (See *ibid.*)

During the proceedings below, the trial court held that under *Gilbert*'s reasoning, Section 87 survived Watson's facial due process challenge. With regard to the private interest at stake, the trial court found that although "Section 87 interferes with a public employee's 'uninterrupted receipt of his paycheck,'" the rule "minimizes the impact on an employee's property interest" "as also was the case in *Gilbert v. Homar . . . .*" The trial court explained that Section 87 limits the summary suspension to 30 business days, and provides that if "the City has not filed charges against the employee" by the end of that limited investigative period, "the employee receives backpay for the time he/she was suspended." Accordingly, the court found that "the

22

City may only temporarily and briefly suspend an employee without filing charges against the employee."

The trial court also stated that Section 87 promotes the City's "very strong and significant" countervailing "interest in ensuring a safe workplace for other employees as well as the public," along with the City's "strong interest in protecting its public property and minimizing its liability to others." It reasoned that Section 87 "limits the City's ability to immediately suspend a public employee" to the following "categories of alleged misconduct—misappropriation of City property, drug addi[c]tion, cruelty to a person in custody, acts constituting a felony or a misdemeanor involving moral turpitude or 'substantiated, job-related extraordinary conduct requiring immediate removal of the employee from the workplace . . . .' [Citation.]" The court found that "[u]nder these limited circumstances," *Gilbert* authorized an employee's immediate suspension without pay because the City has an "urgent need [to] protect[ ] . . . its other employees, the public and its property . . . ."

The trial court further concluded that "Section 87's risk of erroneous deprivation is minimal because the City is required to fully investigate allegations of misconduct during the brief 30-day suspension period." According to the trial court, "[t]he investigation ensures there are 'reasonable grounds to support the suspension without pay.' " (Quoting *Gilbert*, *supra*, 520 U.S. at p. 933.) The trial court stated, "Section 87 requires the City to make some initial assessment of exigency 'requiring' immediate removal from the workplace based upon the employee's job-related conduct where the employee's misconduct is not

23

specifically set forth in Section 87."[13]  In response to Watson's argument that "this initial determination . . . ought to be made by someone independent of the City," the court stated such a requirement would be "impractical" because "it effectively undermines the City's purpose behind Section 87—the need to swiftly protect other employees in the workplace, City property and the public from an employee's job-related extraordinary conduct."

Upon applying the *Mathews* factors to Section 87, the trial court concluded that "[t]he emergent need related to the circumstances enumerated in Section 87, coupled with workplace safety provides a substantial justification for interruption of [Watson's] interest in an uninterrupted paycheck."  Put differently, the court opined that "Section 87 with its procedural safeguards strikes an appropriate balance between the employee['s] property right to his/her livelihood and the City's need to protect other employees in the workplace, the public and its property under certain emergent conditions."  Accordingly, the trial court denied Watson's mandamus petition insofar as it alleged that Section 87 was facially unconstitutional.

Curiously, Watson does not explicitly refute—or even address—the trial court's use of the *Mathews* test and/or *Gilbert*'s reasoning to reject his facial challenge to Section 87.  The closest Watson comes to doing so is when he intimates in his opening brief that the trial court undervalued the gravity of the private interest at stake.  He argues that Section 87 could allow the City

---

[13] As we explained in Discussion, part A, *ante,* Section 87 applies to accusations involving "job-related, extraordinary conduct requiring immediate removal of the employee from the workplace" that have been "substantiated."

24

to suspend an employee without pay for 42 calendar days[14] before filing charges against that individual, and that "[e]ven if exigent circumstances exist, a 6 week period without pay and a chance to challenge the unpaid leave simply cannot meet constitutional due process requirements."

In advancing this argument, Watson overlooks the fact that Section 87 authorizes "a summary suspension for a period *not to exceed 30 [business] days*," which "shall be used by [the City] to *expeditiously* complete an administrative investigation," and that this period of suspension can be terminated by the City prior to the expiration of 30 business days. (Italics added.) Thus, the text of Section 87 does not demonstrate that the City uses the rule to suspend employees for 42 calendar days in the generality or great majority of cases. For that reason alone, Watson's attempt at resuscitating his facial due process claim fails.[15]

Furthermore, Watson's categorical assertion that a 6-week period of suspension without pay per se violates an employee's right to due process is belied by the fact that "the United States Supreme Court has rejected absolute rules" for this type of claim because "the precise dictates of due process are flexible and vary according to context." (See *Today's Fresh Start, Inc.*, *supra*, 57 Cal.4th at pp. 212–213.) As a matter of fact, the Supreme

---

[14] (See fn. 4, *ante*.)

[15] (See *Zuckerman*, *supra*, 29 Cal.4th at pp. 38–39 ["We evaluate the merits of a facial challenge by considering 'only the text of the measure itself . . . .' [Citation.]"]; *420 Caregivers, LLC*, *supra*, 219 Cal.App.4th at p. 1335 ["Under the more lenient test [for facial constitutional challenges], the challenging party must establish that the statute is unconstitutional ' "in the generality or great majority of cases." [Citations.]' [Citations.]"].)

Court stated that a 90-day delay between the date a bank official requests a hearing on the FDIC's suspension of that official and the government's decision thereon would not necessarily violate due process,[16] and that a nine-month delay in obtaining a decision on an administrative appeal of a public employee's termination would not be "unconstitutionally lengthy *per se*."[17]

Additionally, Watson cites—with minimal supporting analysis—multiple decisions he claims demonstrate that Section 87 is unconstitutional on its face because it does not provide employees with any presuspension notice and opportunity to be heard. With one exception, the excerpts of the authorities Watson cites, however, address either the process due prior to (a) termination from employment or (b) the issuance of an order requiring a litigant to pay restitution.[18] (See

---

[16] (See *Mallen, supra,* 486 U.S. at pp. 231–232, 237–239, 242–243 ["[E]ven though there is a point at which an unjustified delay in completing a post-deprivation proceeding 'would become a constitutional violation,' [citation], the significance of such a delay cannot be evaluated in a vacuum. . . . [¶] . . . [¶] . . . We . . . conclude that the 90-day period is not so long that it will always violate due process."].)

[17] (See *Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 535–536, 546–547, & fn. 11 (*Loudermill*) ["[The employee] offers no indication that his wait was unreasonably prolonged other than the fact that it took nine months. The chronology of the proceedings set out in the complaint, coupled with the assertion that nine months is too long to wait [for a decision on the employee's posttermination appeal], does not state a claim of constitutional deprivation."].)

[18] The exception is *Linney v. Turpen* (1996) 42 Cal.App.4th 763, which concerned the six-month suspension of an airport police officer as a form of discipline following a formal

26

*Loudermill, supra*, 470 U.S. at pp. 542, 547–548 [discussing the process due prior to termination]; *Clements v. Airport Auth.* (9th Cir. 1995) 69 F.3d 321, 331–332 [same]; *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 212, 215–216 [same]; *Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 947 [same]; *Titus v. Civil Service Com.* (1982) 130 Cal.App.3d 357, 362 [same]; *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1278 [same]; *Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1547 [discussing the process due preceding the issuance of a restitution order].) Thus, it is not apparent that these decisions undermine the trial court's reasoning for rejecting his facial due process claim, and Watson has not shown otherwise. (See *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 (*Hodjat*) ["[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].)

For the foregoing reasons, we conclude Watson has not overcome the presumption of correctness accorded to the trial court's rejection of his facial due process challenge.[19]

_____

hearing. (See *id.* at p. 765.) *Linney* decided whether the manner in which the hearing officer was selected violated due process. (See *id.* at p. 768.) *Linney* had no occasion to consider whether the summary suspension of a public employee pending an investigation would offend the employee's due process rights. (See *id.* at pp. 765, 768.)

[19] In connection with his facial due process challenge, Watson also attempts to rebut an argument respondents made below that Section 87 survives constitutional scrutiny because it was modeled on Government Code section 19574.5. We need not reach this argument because Watson has not overcome the presumption of correctness accorded to the trial court's reasoning

27

2.    *Watson's as-applied challenge fails because he has not demonstrated that the City's application of Section 87 violated his procedural due process rights*

Relying on the *Mathews* test, Watson contends that the City violated his due process rights in the course of suspending him without pay pursuant to Section 87.  His as-applied challenge to Section 87 relies upon three premises:  (1) "Watson's summary suspension without pay for over 12 weeks and the attendant stigma were so significant that they called for a predeprivation right to respond"; (2) *Gilbert* and *Mallen* establish that "the determination for immediate removal from the payroll needed some element of independent vetting"; and (3) if the City insisted on suspending Watson without predeprivation notice and an opportunity to be heard, then *Loudermill* required the City to safeguard its interests by placing Watson on paid leave.  Watson has failed to support adequately any of these premises.[20]

The first premise rests on the implicit assumption the City did not afford Watson constitutionally sufficient notice and an opportunity to be heard during the approximately 12-week period starting when he was summarily suspended on March 13, 2017 and ending on the date the City terminated him on June 7, 2017.

---

for denying relief on his facial due process claim, which is independent of whether Government Code section 19574.5 comports with due process and whether Section 87 is sufficiently analogous to that statute to survive a constitutional challenge.

[20]  Watson further contends that "the City relied on little more than an unsubstantiated allegation in an email to Ficker that claimed Watson cracked a windshield in a truck."  That factual assertion fails as we have explained in our Discussion, part A, *ante*.

28

(See *Today's Fresh Start, Inc., supra*, 57 Cal.4th at p. 212 [" 'The *essence* of due process is the requirement that "a person in jeopardy of serious loss [be given] *notice* of the case against him and *opportunity* to meet it," ' " italics added].)  Aside from his argument that the *Skelly* hearing lacked reasonably impartial, noninvolved decision-makers (see Discussion, part C, *post*), Watson fails to support his first premise.

The trial court found "the City hired an independent investigator to conduct an investigation of the March 10, 2017 event."  The Commission found that this independent investigator interviewed Watson on April 7, 2017 regarding the February 1, 2017 and March 10, 2017 incidents.  Furthermore, during the hearing before the Commission, Watson's counsel represented that on the date of Watson's April 7, 2017 interview, counsel provided the investigator with a copy of a statement prepared by Watson in which he described his account of the March 10, 2017 incident (the March 19, 2017 statement).

We also note that although there is a memorandum dated April 19, 2017 from Ficker to Melkonian that claims an "administrative investigation report" prepared by the independent investigator was attached thereto, the administrative investigation report is not enclosed with the copy of the memorandum included in the administrative record.  Additionally, Watson concedes that Ficker reviewed the findings of this investigation before he prepared charges against Watson.  (See *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party.  [Citations.]'  [Citations.]"].)

29

In some circumstances, "oral or written notice of the charges[,] . . . an explanation of the employer's evidence, and an opportunity to present [the employee's] side of the story" may be all the process that is due before the employer deprives an employee of a property interest.  (See, e.g., *Loudermill*, *supra*, 470 U.S. at p. 546; *ibid.* [holding that the federal due process clause requires states to offer these procedures before they can terminate tenured public employees].)  It is possible that Watson's April 7, 2017 interview with the independent investigator afforded Watson such notice and opportunity to present his side of the story, and Watson has failed to supply us with enough information to rule out that possibility.  (See *Gilbert*, *supra*, 520 U.S. at p. 932 ["So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all . . . ."].)  Oddly, Watson does not discuss this interview in his briefing, explain why the interview fell short of the City's obligation to afford Watson with due process of law, or provide a detailed chronology of the investigator's and/or the City's conduct in the 12-week period in which Watson claims he purportedly was deprived of due process.

Consequently, Watson has not discharged his obligation of adequately developing the factual basis of this aspect of his as-applied challenge, thereby preventing us from assessing the private interest affected by his summary suspension.  (See *Lammers*, *supra*, 83 Cal.App.4th at p. 1328 ["[A]n applied challenge looks to the *particular circumstances* of [a rule's] application to a specific individual," italics added].)

30

Watson's second premise fares no better. *Gilbert* concluded the fact the police officer therein was "arrested and then formally charged with a felony . . . . serve[d] to assure that the state employer's decision to suspend the employee [was] not 'baseless or unwarranted,' [citation], in that an independent third party ha[d] determined that there [was] probable cause to believe the employee committed a serious crime." (See *Gilbert*, *supra*, 520 U.S. at p. 934.) Similarly, *Mallen* found that the indictment of an official of a federally-insured bank for making false statements to the FDIC established "there [was] little likelihood" that the suspension of that official was "without basis" in part because "the finding of probable cause by an independent body demonstrate[d] that the suspension [was] not arbitrary." (See *Mallen*, *supra*, 486 U.S. at pp. 231–232, 236–238, 244–245.) Neither *Gilbert* nor *Mallen* considered whether a public employer's suspension of an employee without pay would run afoul of due process if it were not preceded by an independent third-party's finding of probable cause. (See *Gilbert*, *supra*, 520 U.S. at p. 934; *Mallen*, at pp. 244–245; see also *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 85, fn. 4 [" '[C]ases are not authority for propositions that are not considered.' [Citation.]"].) Indeed, on at least one prior occasion, the high court held that a state agency could temporarily deprive an individual of his property interest based on the agency's *own* findings. (See *Barry v. Barchi* (1979) 443 U.S. 55, 57–61, 63–66, 68 [holding that the state agency did not violate due process when it suspended a horse trainer's license without a predeprivation hearing based on the agency's expert's finding that the horse had drugs in its system; stating that "[a]t the interim suspension stage, an expert's affirmance, although

31

untested and not beyond error, would appear sufficiently reliable to satisfy constitutional requirements"; but also holding that the statute authorizing the suspension violated the trainer's due process rights because it did not "assure[ ] a prompt postsuspension hearing"].)

*Gilbert* counsels against the adoption of "categorical prohibition[s]" or "absolute rule[s]" in the procedural due process context, and recognizes there are "occasions . . . where a State must act quickly, or . . . it would be impractical to provide predeprivation process . . . ."  (See *Gilbert*, 520 U.S. at p. 930.) Given that Watson does not contest the trial court's finding that "[a]ssessment by a third-party in the face of an exigency" covered by Section 87 would be "impractical," *Gilbert* did not require the City to hire an independent investigator to verify the allegations against Watson before it suspended him.[21]

Lastly, we find unavailing Watson's assertion that due process required the City to place him on leave with pay if it chose to summarily suspend him.  Admittedly, *Loudermill* did state that, "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay."  (See *Loudermill*, *supra*, 470 U.S. at pp. 544–545, fn. omitted.)  Nevertheless, the *Gilbert* court later dismissed this passage from *Loudermill* as

---

[21] Watson also suggests that *Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, required the City to enlist a third-party investigator before suspending him. Because Watson provides no analysis on this point, we do not address it further.  (See *Hodjat*, *supra*, 211 Cal.App.4th at p. 10 ["[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].)

dictum. (See *Gilbert, supra,* 520 U.S. at pp. 929–931.) Thus, *Loudermill* does not hold that Watson had to be paid during the City's investigation into his alleged misconduct.

In sum, Watson's as-applied due process challenge fails.

3. *Watson cannot salvage his as-applied challenge by belatedly invoking his dignitary interest in being heard*

Watson claims that his "dignitary interest in being heard" counsels in favor of a finding that the City applied Section 87 in a manner that violated his due process rights. Specifically, Watson contends in his opening brief that "[t]he City treated Watson as 'a nonperson, an object, rather than a respected, participating citizen'" in the course of summarily suspending him. In support of this argument, he cites the March 19, 2017 statement noted in our Discussion, part B.2, *ante,* for the proposition that on March 13, 2017, "Melkonian simply told Watson [the City was] investigating, did not let him have union representation, and handed him the summary suspension letter."

Respondents counter in their appellate briefing that Watson did not invoke this "dignitary interest" during the trial court proceedings. In his reply brief, Watson does not dispute—and thus impliedly concedes—that he failed to raise explicitly this contention below. (See *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].) Rather, he attempts to minimize the impact of his omission by insisting that he "now frames the argument slightly differently on appeal," the dignitary interest factor "can rightly . . . be viewed as a subset of Watson's private interest," and asserting that below he stated he

33

was stigmatized by the decision to suspend him summarily for 12 weeks without pay or a predeprivation opportunity to respond to the allegations against him.

"'"Points not raised in the trial court will not be considered on appeal. [Citation.] 'Even a constitutional right must be raised at the trial level to preserve the issue on appeal [citation].' [Citation.]"'" (*Gruber v. Yelp Inc.* (2020) 55 Cal.App.5th 591, 611, fn. 11.) Although we acknowledge that "exceptions [to this rule] are made in rare case[s] for purely legal issues" (see *ibid.*), this is not such a case. As we noted above, Watson's invocation of a dignitary interest relies upon his account of Melkonian's interaction with him on March 13, 2017. By failing to raise this contention below, Watson denied the trial court the opportunity to undertake an analysis that falls exclusively within that court's purview—i.e., assessing the credibility and veracity of the March 19, 2017 statement. (See *San Diego Unified School Dist.*, *supra,* 214 Cal.App.4th at pp. 1140–1142 [" 'Under the independent review standard, the trial court may weigh the credibility of witnesses.' " [Citation.] . . . [¶] . . . [¶] " '[On appeal, w]e do not reweigh the evidence.' "].) Accordingly, we disregard Watson's untimely invocation of his dignitary interest.

## C. Watson Fails to Establish that His *Skelly* Hearing Lacked Reasonably Impartial, Noninvolved Decision-Makers

"In *Skelly, supra,* 15 Cal.3d 194, the California Supreme Court held that in order to satisfy due process, an agency considering disciplinary action against a public employee must accord the employee certain 'preremoval safeguards,' including notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the

34

right to respond, either orally or in writing, to the authority initially imposing discipline.' [Citation.] The Supreme Court's directive gave rise to an administrative procedure known as a *Skelly* hearing, in which an employee has the opportunity to respond to the charges upon which the proposed discipline is based." (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 280 (*Flippin*).) An "employee's right to respond" at a *Skelly* hearing " 'implies an opportunity for the employee to present an explanation or version of whatever events or circumstances led to the potential dismissal "before a reasonably impartial, noninvolved reviewer . . . ." [Citation.]' " (See *ibid.*)

"[M]ere involvement in ongoing disciplinary proceedings does not, per se, violate due process principles. Those principles are violated, conversely, if the official or officials who take part in the [administrative] proceedings are demonstrably biased or if, in the least, circumstances such as personal or financial interest strongly suggest a lack of impartiality." (See *Burrell v. City of Los Angeles* (1989) 209 Cal.App.3d 568, 582 (*Burrell*).)

Watson argues that the City "violated Watson's procedural due process rights by having Melkonian and Ficker[,] who were intimately involved in Watson's summary suspension and removal from the payroll—a punitive action—as two of the three members of his *Skelly* panel." First, Watson contends that Ficker "pre-judged the case from the outset" by "determin[ing] an 'urgency' existed constituting 'substantiated, job-related extraordinary conduct' warranting summary suspension under [Section] 87," and "Melkonian showed that he would play along with the punitive action" by summarily suspending Watson. Second, Watson claims "Ficker and Melkonian had a specific

35

interest in upholding the termination because, had they not done so, the City would have owed Watson back pay and benefits—a result that surely Ficker and Melkonian did not want since they involved themselves in prejudging the case and removing Watson without pay." In support of Watson's assertion that Ficker prejudged the case, he maintains that "before the *Skelly* hearing[,] Ficker not only drafted the charges, but also made credibility determinations, investigatory conclusions and convinced himself the charges he drafted were accurate." For the reasons discussed below, we conclude Watson has failed to establish the City deprived him of a reasonably impartial, noninvolved reviewer at his *Skelly* hearing.

*Flippin* rejected a public employee's claim that his employer violated his due process rights by allowing a manager to serve in a "dual role as the *Skelly* hearing officer and the person who initially recommended [the employee's] discharge." (See *Flippin*, *supra*, 148 Cal.App.4th at pp. 276, 280–283.) The manager's "involvement consisted of" drafting the charges against the employee; "investigating the charges of misconduct; recommending [the employee's] discharge; and conducting the *Skelly* hearing at which [the employee] had the opportunity to respond to the charges and recommendation." (See *id.* at pp. 276, 283.)

*Flippin* reasoned "[t]here is no authority that precludes an officer from performing such a dual function," "having the same official who initiates an employee disciplinary proceeding also conduct the *Skelly* hearing" is "apparently [a] common practice," and the employee was entitled to seek further administrative review of the dismissal, "including a full evidentiary hearing

36

before a neutral hearing examiner."[22]  (See *Flippin*, *supra*, 148 Cal.App.4th at pp. 281–283.)

Ficker's and Melkonian's involvement in Watson's disciplinary proceeding was no more extensive than was the manager's in *Flippin*.  Just as the manager in *Flippin* drafted the charges against the employee and recommended dismissal upon reviewing evidence concerning the charges, so too did Ficker. (See *Flippin*, *supra*, 148 Cal.App.4th at pp. 276, 283.) Admittedly, there is no indication the manager suspended the employee in *Flippin* (see *id.* at pp. 276–277), whereas Ficker, in consultation with a human resources officer, decided to suspend Watson summarily, and Melkonian signed the letter imposing the suspension.  This distinction is immaterial, however, because Ficker's conduct simply indicates he believed that an accusation that Watson engaged in job related, extraordinary conduct requiring immediate removal from the workplace had been substantiated (see Discussion, part A, *ante*), a conclusion akin to the manager's recommendation to dismiss the employee in

---

[22] Watson claims that the portion of the *Flippin* decision addressing the manager's dual role is dictum because earlier in the opinion, the Court of Appeal had already decided the employee waived his right to a *Skelly* hearing.  Yet, the *Flippin* court indicated that its discussion of the "dual role" issue was an alternative basis for its conclusion that the employee failed to establish a due process violation.  (See *Flippin*, *supra*, 148 Cal.App.4th at p. 281 ["*Even absent any forfeiture*, no due process violation occurred," italics added].)  Thus, this aspect of the *Flippin* opinion is not dictum.  (See *People v. Mendoza* (2020) 44 Cal.App.5th 1044, 1056, fn. 5 [" 'It is well settled that where two independent reasons are given for a decision, neither one is to be considered mere *dictum* . . . .' [Citations.]"].)

*Flippin.* (See *Flippin*, at p. 276.) Furthermore, just as the employee in *Flippin* was entitled to an administrative appeal of his discharge before a neutral decision-maker (see *id.* at p. 283), Watson had the right to appeal his termination to the Commission.[23]

Watson's contention that "Ficker and Melkonian had a specific interest in upholding the termination" is also without merit. To support this argument, Watson cites a portion of Ficker's testimony from the administrative proceedings in which he stated that prior to the *Skelly* hearing, he was "convinced that the charges were accurate." Drawing all reasonable inferences in favor of the trial court's judgment as the substantial evidence standard of review requires (see *San Diego Unified School Dist.*, *supra*, 214 Cal.App.4th at p. 1142), we conclude this testimony merely indicates Ficker believed the charges had evidentiary support, and not that Ficker was unable to be impartial during the *Skelly* hearing.

Moreover, the trial court found that "[n]o evidence suggests Ficker and/or Melkonian would have been subject to any kind of scrutiny by the City if the City did not move forward with its intentions to terminate [Watson] thereby requiring the City to pay a few months of back pay to [Watson]." The court also found that "Ficker and M[e]lkonian would not be personally liable for [Watson's] back pay." Because Watson does not contest either of these findings, we presume they are correct. (See *Shenouda*, *supra*, 27 Cal.App.5th at pp. 512–514.) Under these circumstances, Watson has not established that Ficker or

_____

[23] Watson does not challenge the impartiality of the members of the Commission.

38

Melkonian were "demonstrably biased" or had any "personal or financial interest strongly suggest[ing] a lack of impartiality." (See *Burrell*, *supra*, 209 Cal.App.3d at p. 582.)

Lastly, Watson argues that *Gray v. City of Gustine* (1990) 224 Cal.App.3d 621, supports his claim that Ficker and Melkonian should not have been panel members at the *Skelly* hearing.  In *Gray*, a city manager demoted a police chief to the rank of lieutenant.  (*Gray*, at pp. 624, 628.)  When the former police chief sought an administrative appeal of that decision, the city manager offered to conduct the administrative hearing and make a recommendation concerning the former police chief's reinstatement to the city council.  (*Id.* at p. 625.)  On appeal of the trial court's denial of the former police chief's mandamus petition seeking an administrative appeal before a neutral decision-maker, the *Gray* court held that "[t]he administrative appeal offered by the city manager was clearly inadequate and failed to comport with the fair hearing aspect of due process." (See *id.* at pp. 625, 631.)  The panel reasoned that "[t]he city manager exercised the punitive action against [the former police chief] and was embroiled in the controversy," and "[d]ue process requires that the hearing judge or judges be impartial."  (See *id.* at p. 631.)

*Gray* does not undermine our conclusion that Ficker and Melkonian could serve on Watson's *Skelly* panel.  *Flippin* explained that an administrative appeal occurs after discipline is imposed at a *Skelly* hearing, and " '[a] right to appeal, in common understanding, occurs *after* final discipline is invoked and implies a further review by another, presumably neutral authority.' " (See *Flippin*, *supra*, 148 Cal.App.4th at p. 282.)  Consequently, allowing " 'the same person who originally imposed the discipline

[to] also review the decision raises grave doubts as to the fairness of the appeal.  [Citations.]'  [Citation.]"  (See *ibid.*)  Those doubts are absent when, as here, the official initiating discipline serves as a *Skelly* hearing officer prior to the formal imposition of discipline.  (See *id.* at pp. 281–283.)

For the foregoing reasons, Watson has failed to show the trial court erred in rejecting his claim that the City violated his due process rights by permitting Ficker and Melkonian to serve as decision-makers at Watson's *Skelly* hearing.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.

CRANDALL, J.*

---

\*  Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.